Here to give you this honorable report of the 2nd Judicial District is now back in session, the Honorable Susan F. Hutchinson, Utah. And please be seated. Your Honor, the second case on the docket is Summary 2-53-0392, Basement, Al-Amin. Claims of Appellant, v. Samantha Harshaw, Defendant's Appellant. Arguing on behalf of the Appellant, Mr. James M. Erdes. Arguing on behalf of the Appellant, Mr. Mark L. Strodowski. All right, good morning, gentlemen. Mr. Erdes, if you are ready, you may proceed. Thank you. May it please the Court, Counsel? My name is Jim Erdes. I represent the Plaintiff Appellant. Her name is Jasmine. Could you stay closer, thank you? Because we're recording and we want the world to hear you. Thank you. Her name is Jasmine Al-Amin. I'd like to start with the issue presented in this case. It's whether a release of all claims presented to an injured motorist within 24 hours of a car accident by her own insurance company, who also insures the at-fault driver prior to this individual ever receiving any medical care and treatment, and where neither the insurance company nor the injured insured knows what the nature and extent of her injury is, whether that is based on a mutual mistake of fact and therefore unconscionable. Just the fact that it happened in that sequence within 24 hours of the accident, that scenario is unconscionable per se or always? I wouldn't say per se because the measuring stick, as you know, is that where the facts, when finally known, reveal an unfair result, then a release should be set aside. But that's a situation where both the insurance company and the injured party believe that they have the information regarding the extent of the injuries. I'm not sure I understand that question. Well, where there is some determination, preliminary determination as to injuries, where a person is seeing a medical provider, correct? Well, yes and no. But see, in this case, I believe a fair argument would be that the insurance company was taking a random shot in the dark. They had no idea. They said, look, we'll cover up to $15,000 of your medical, but we are going to obligate you to, we are going to limit your bodily injury recovery to $800. Now, the reason why that's significant is because what we're talking about in this case is a rear-end motor vehicle collision. State Farm knew very well that that means that they are 100% liable to, on behalf of their at-fault driver, to their own insured. So it just seems so cheap for an insurance company to, within 24 hours, extend out $15,000 for medical expenses, but condition that on a release of all claims in exchange for a very small amount. And the plain language of the release stated everything you just mentioned. It did. And you make an argument in your brief that the practice that you just described should be scrutinized not only because there is evidence of a mutual mistake of fact, but also because it is against public policy. What authority do you have for that argument that it's against public policy? Well, the case law. The case law. What case law? You didn't cite anything in your brief. I think Newborn v. Hood. And actually, we rely on the same cases. It's just the interpretation of the cases that we differ on. In every single one of these cases, the injured party was represented by legal counsel. In this case, that was not the case. In the cases where the court held that the release should not be invalidated, there was a significant passage of time and the plaintiff had an opportunity to get evaluated by a medical provider. Even in Newborn v. Hood. Well, your client had the ability to get evaluated by a medical provider. She could have just said, you know, I'm not going to sign a release. I've got until I think it was the 29th to sign. Correct? That's true. How is that a mutual mistake? That's a unilateral mistake. Well, there had to be at the moment in time when State Farm issued that release to Mrs. Aulani, there had to have been a meeting of the minds because that's what forms a valid enforceable contract. So the problem that I have with this is that within 24 hours, State Farm went to an unrepresented insured, their own insured, and said, we are going to offer you $800 to resolve this claim. And I just think that when the facts finally known that she didn't know she had a herniated disc, she did not know that at that time and neither did State Farm. And that's, in my opinion, the mutual mistake of fact. So that's what these cases say. If you don't know, if both parties don't know what they're getting into when they attempt to release a claim, then when the facts are finally known, it should be invalidated based on the concept of unconscionability. That's the way I read these cases. I believe that's the law in the State of Illinois. And besides that, do we really want insurance companies trying to limit their liability within a very short period of time when people just have been in an accident and are obviously concerned about a variety of things? The repair of their motor vehicle, getting medical care and treatment. I mean, you might have some financially struggling. You didn't bring an action against State Farm for fraud or bad faith. No, sir, I did not. No, Judge, I didn't. You could have if you believe there was bad faith or fraud by State Farm. Are you familiar? I'm trying to envision that theory of liability, to be honest. There's no allegation that State Farm engaged in bad faith. Well, I did not. Well, I did not make that claim. However, it is abundantly clear that they did, and that is one of the basic. You didn't make the allegation. And the Supreme Court said in Moneer v. Chamberlain that when both parties have the same insurer, the insurance company has the obligation of good faith to both parties, and there's no allegation that did not occur. Okay, well, a basis for the, I believe it's implied that they exercised bad faith by virtue of sending a release within 24 hours of an accident on an injury that they had no idea. She told the agent that she was going to go see somebody. Right, so she didn't even know. She did not know. Instead of waiting until after she got assessed, she signed the release. I know, but isn't that the law in the state of Illinois that when the, first of all, I think the record states that she didn't realize that she was releasing the claim because this was her own insurance company also. She did say that she read it, though. I don't even know, you know, it was electronically sent, Judge Hutchinson, so, you know, another factor to consider. I don't like to read things online either, but the fact remains that that's what we do today, and if she had it and she read it, insurance releases are interesting. Yeah. They're not, you know, courts have said if you're going to do anything that seems unusual, it has to be in bold letters. Pretty soon the entire release will be in bold letters by the time, you know, courts have their way and then the insurance company changes them. The fact remains, though, she said she read it, and it does have $15,000 identified in the release. She also received an email that said if you don't sign this, your claim will be delayed. May be delayed. May be delayed. May be delayed. May be delayed. But she didn't even have to wait with that time. You and I are looking at this from legal eyes. We're talking about a completely unsophisticated, somebody who has no knowledge of how insurance claims work, which is most people don't. Most people don't understand insurance companies, how they process claims, how they release claims, the significance of signing a release. They don't realize that, especially 24 hours after an accident. So to answer your question, Judge Hutchinson, originally, yes, the significant factor that differentiates this case from the others is that window, that 24-hour period, in my opinion, that makes this case very intriguing in terms of characterizing this release as unconscionable. And, of course, we now know that she suffered a herniated disc as a result of this car accident. We know this was a 100% liability case. It's 100% liability. We look at this from the standpoint of when the release was signed, not later, what both parties knew at the time. State Farm knew it was a fender bender. It was a rear-ender, not a fender bender, but a rear-end collision. And they established a release. And once they established that there was a release, it's plaintiff's burden to show by clear and convincing evidence that the release is invalid. Correct? That is the law. And what's the clear and convincing evidence that there was a mutual mistake? That neither party knew that she had a herniated disc. But that was clear. Both parties didn't know. But, okay, so if both parties... She's the person that made the decision to read the release and sign it. Okay, well, if both parties did not know the nature and extent of the injury that they were releasing, how could that be? Because all of the cases that you discussed are never distinguishable because in those situations, there is a mutual mistake by both parties as to the nature and extent of the injuries. And here, there was neither party had information. So in the two cases, Simmons and DeMarie, both of those cases involved a situation where the plaintiff and the defendant settled their claims after several months of evaluation and medical reports. And they arguably were informed when they entered into that release agreement. That's not the case with Ms. Aulani. This is something completely different. She did not know, and neither did the insurance company. There just wasn't anything to base a settlement on at that moment in time. So your position would be then, the insurance company cannot request or recommend or send a release form unless there is first a medical evaluation, so both parties know the full extent of the injuries. Is that your position? No, no. But it is interesting that State Farm knew at the moment in time that they sent that release that there would be medical care and treatment at least up to $15,000. And so I find that very significant. It's a situation from my perspective where an insurance company is attempting to take advantage of an insured. It's as simple as that. And to answer your question, I think the better practice would be that, yes, if they engage in this practice, they do so at their own peril because it may not. You're shifting the burden. That's shifting the burden to the insurance carrier. The law is quite clear that once a release that's valid on its face is presented, it's up to the plaintiff to establish by clear and convincing evidence that the release is invalid. It's burden shifting. I beg your pardon? Isn't that burden shifting? I don't see that. I don't see that at all. State Farm has to prove. State Farm is legally responsible for all of the damages that flowed from that as a result of that accident. They knew that. They knew that they were responsible. They're obligated to pay Ms. Alani, and they basically obligated her to, they limited her ability to do that without knowing the nature and extent of the damages that were caused by their insurer. And I believe that's what we want. You just, in that response you just said, State Farm has to know before they can present the release? I think they have to know something about the nature and extent of her injury. I mean, why would they submit a release of all claims within 24 hours without knowing anything about the nature and extent of their claims other than to gain an advantage over their insurer, which spells, in my mind, unconscionability. It's not fair. Well, wasn't your client, though, once they got in touch or they got in touch with her, she was concerned about, well, how am I going to pay for this? I mean, they were trying to assist her in her concern over seeing this medical provider. Why is that unconscionable? Well, maybe that aspect is not unconscionable. However, the bodily injury, the rest of the, they're not just responsible for the medical expenses. By the way, was that an alarm for me? Yes, it was. Okay. You can finish your thought. Okay. So it's not just the medical expenses that they're obligated to pay. The big part of all these claims is the bodily injury for an injured party, the pain and suffering, the future pain and suffering, the nature and extent, the loss of normal activities. Those are the big things. But they didn't, in this release that they sent her, it didn't say they wouldn't pay her claim if she waited. It said that her claim might be delayed. There's a significant difference, even to a layperson, between those two concepts. But it's certainly not, it's not spelled out as to whether that means her property. Which claim are we talking about? Her car? Maybe the insured is thinking, oh, my gosh, if I don't sign this, they're not going to fix my car. You know what I mean? So it's not at all clear. It's ambiguous. From my perspective, that's the way it is. It's just, it smells bad. It's just not. That 24 hours. You didn't cite any authority for this proposition that it, quote, unquote, smells bad. And, you know, we, generally speaking, that's an issue or that argument is forfeited. Why should we not forfeit that argument? Well, I believe the court has the authority to do what? To excuse the forfeiture? Well, I believe the court has the authority to impose the law, even if it's not pointed out to the court by me. So, I mean, I think that you have the authority to say, well, wait a minute, this is, you know, this is bad faith. We're not a policy court. That's the court above us. Right. Thank you very much. Just a second, please. Justice Kennedy? Okay. You'll have an opportunity for response after counsel is finished if you choose to do so. Thank you. Thank you. And I'm just going to say counsel until you say your name so I know how it's handled. Good morning. My name is Mark Sprodelsky. Good morning, counsel. I represent the appellee, Ms. Samantha Harshaw. And you might want to pull that mic just up a little bit. Thank you. If it will go up. I'll get situated here for you. Is that better? We are here today before you to ask that this panel affirm the decision of the lower court in its conclusion that the release was valid, that there was no mutual mistake, a fact that it was not unconscionable, and that the appellant herein failed to establish by clear and convincing evidence any such factors sufficient to invalidate that release. I will say that I have never, I've had accidents, and I've never had such a quick response to have documents or any sort of paperwork sent to me. Why did this happen, if you know? I can't speak to the inner mechanisms of how State Farm handles its processing of claims that are made. I can tell you that in this situation, perhaps they don't come to our desk because the release is signed and there's no litigation following it because most counsels practicing understand that it is a valid document that prohibits further litigation, and therefore they're not litigated. Perhaps that's why we don't see them. Why did it come so quickly in this case? I think the answer would be that this accident happened on the 21st. She telephoned State Farm the 22nd in the afternoon while at work, received the release at approximately 5 p.m. after they discussed it. We're going to pay for your claims. You have some concerns. We're going to issue this release. Later that evening, contrary to what Judge Baronis indicated in his memorandum order, she did not go to the ER at 11 a.m. She went to the ER at 11 p.m. after she spoke with State Farm, after she received the release, and the evidence in the record indicates that she didn't sign the release until the day following on the 23rd. So to answer your question in terms of why it happened so quickly, I can't speak to it, but I don't know of any law that prohibits the resolution of claims in an expeditious fashion. I think the law is the contrary. We are encouraging expeditious settlement in this State because we want to eliminate it. Counsel, yeah, I understand the policy argument on that side, but what's interesting to me about this case is that State Farm is on both sides. And so to what extent did State Farm disclose to the plaintiff here that they were representing her adversary in the claim? Well, again, I can't speak to that directly because I wasn't part of the State Farm claims process. It came into the situation much later. What I can tell you is that if there were such allegations of fraud, collusion, misrepresentation, pressure being exerted by State Farm upon this individual, those things should have been brought before the court with sufficient evidence. And the trial court specifically found that there was zero evidence of collusion. There was zero evidence of fraud. Well, but the allegation here is that she misunderstood. She thought what she was signing was, in effect, what I think most people understand MedPay benefit to be. And the actual release language itself, if she read it in the two minutes that she had it open, it seems unlikely she read 325 words in two minutes. But nonetheless, even if she had read it, I don't think there's any way you can say it's unambiguous with regard to some of the language. It doesn't say in the title that this is a settlement of a claim against someone that State Farm insures as against her, for example. So there's no disclosure that they represent both sides. But further, the consideration listed doesn't state what the $800 is for. The $15,000 doesn't. It's not a check. If you submit a medical bill, we'll pay it up to that amount. So the release itself is what you're relying on here. And what they're saying is it's unconscionable. And there could be a couple of reasons for that. The main one that's been briefed is mutual mistake. All right. And so I'll get to that in a minute. But I just wanted to go through the actual document. And it's your burden to prove that this is a contractual release. It's consideration and absence of mistake, deceit, fraud. So isn't that your burden, first of all? Well, yes, I would agree with that. Okay. So to establish a contract, you've got to have meaning in the minds. And so we're here. There's no disclosure that you're on both sides of the claim. How is an insured consumer to be expected to understand what's happening? Well, again, I can't speak to the inner workings. But I don't think there's any indication that there was not a disclosure, that there were separate interests involved here, whether there was. We know that she contacted her agent, her own State Farm agent, the day of the accident for the insurance card. The following day, the evidence is that she telephoned State Farm Claims and made her reach out herself, presumably through an 800 number or through some contact information. She called to establish the claim. She initiated the contact. It wasn't vice versa, evidencing some type of misrepresentation. Oh, hey, you've got to get this done right. Right. Doesn't everybody call their own insurance company when they've had an accident? And that's what she thought she was doing. I don't know that to be the case. She was calling State Farm Claims at the advice of her agent, I understand, from the affidavit of Ms. Alani the following day. But, again, if there were going to be, as there were here today, without any supporting evidence or case law, claims of bad faith or coercion or misrepresentation or fraud, boy, that would have been nice to hear. Does the obligation of State Farm to act in good faith with respect to both parties require them to disclose to the injured party that they also insure the driver of the other vehicle? I am not sure if that's part of the Monier decision, but certainly they have an obligation to act in good faith.  To what extent they are obligated to make that specific verbal or written disclosure, I can't speak to that. But what I can speak to is that we have a document here which has been reviewed, this agreement and release, by multiple courts, including Simmons with the almost near exact language, which has been upheld as clear and ambiguous, no reason to enter into parallel evidence to determine the meaning. We know what now and forever means. We know what now and in the future are known and unknown means. So that's in the context of a third party insurer. So if I'm insured by State Farm and Allstate is the other side, I'm on notice that this is not my insurance company. So I'm just going back to whether or not this contract is valid ab initio, just given that there's an obvious misunderstanding alleged, whether or not that's proven is another factor. But this is a motion to dismiss based on this contract. So why is this not a question of fact to be determined at some other stage and not a motion to dismiss? Well, first, that issue was never raised by the plaintiff in the lower court, that there was some distinction between a first party or a third party. What was the misunderstanding of what she was being presented with? Well, I think the misunderstanding, I would respectfully disagree with that. It wasn't what she was being presented with. It was that she subsequently, when she saw her chiropractor, learned that she had an MRI that revealed herniated discs, and that was the change in circumstances that was confusing to her, not the fact that she received a release document and executed it after two minutes. I think contrary to what we see in newborn and what we see in Sherer Hospital in Reed, I think what the affidavit of Ms. Alani clearly indicates is that she never even read this. Justice Hutchinson asked, did she read it? Was there an admission that she read it? There is nothing in the lower court factual analysis that would indicate that she, in fact, did. She simply possibly went ahead and signed it. The indication was that she had a form. But your insurance company said she had to. No, I didn't. That's a big factor here, but let's move on. Why am I incorrect in approaching this from the perspective that this is your contract, you have to prove its binding? First of all, there's been no contest that this was a valid contract. There was never a contest raised by the plaintiff in the underlying matter. You raised it as an affirmative defense. That's correct in the motion to dismiss. That's correct. And we've done so, and there was no contest on it. It was uncontested. The release has been reviewed by multiple courts and found to be clear and unambiguous. There has never been an issue before Judge Baronis and no factual allegations raised that it wasn't a valid contract. There was no dispute that she signed it. There was no indication that she read it, but there's no dispute that she signed the contract. So there's been nothing in the record at all to indicate that it's not a valid contract. All right, so moving beyond that then, the case law focusing on mutual mistake seems to indicate that it is a factor how soon after a release is signed. It could make an impact. So where there are months of consultation with medical staff, it's less of an imperative to go and say this is a mistake, whereas when it's sooner, I think there were cases of three days and 14 days where the courts have said that the mistake was involved. So what's your position on that argument? Well, I think that we're kind of mashing two of the elements together, the mutual mistake and the unconscionability. Certainly the timing of the release is... Is not mutual mistake under the umbrella of unconscionability? My understanding is that they are separate elements to be determined to invalidate the release, that they are similar, that the mutual mistake led to an unconscionable result, not that there was unconscionability, you know, separate and apart, but together. They are somewhat together. But you are correct that there is an element of timeliness that the courts can review with some of the elements to determine whether or not the contract was unconscionable. The underlying court here, Judge Barones, reviewed the factual analysis and the timing. There is no case law. There is no statute that I'm aware of that indicates that there is a timeline of 24 hours or 48 hours for which the release should be issued. There was no argument or citations provided that that is a patently bad faith or coercion or what have you. No, but isn't it evidence that neither party understood the extent of the injury? How could you? Well... She hadn't even consulted her doctor. She had consulted the doctor when the release was signed. State Farm had no information concerning the nature of the injury because the release was executed at 5 p.m., the E.R. visit was at 11 p.m., and she executed it the next day. This case is different because State Farm had none of that information. You know, the reliance by the appellant here has always been on Newborn. And the Newborn case is factually distinguishable right down to space because the case says, and I quote, it was stipulated that at the time of settlement, neither plaintiff or defendant's insurance adjuster had any knowledge that the plaintiff had suffered a trauma that would eventually cause her to suffer a heart attack. There was a stipulation here. There was no such stipulation as to what Ms. Aulani's injuries were or were not or were going to be. State Farm knew nothing. They provided her with a document with adequate compensation. That compensation in consideration was paid of $800. Counsel was retained by Ms. Aulani and bills were submitted in furtherance of that release. All right. What was the $800 for? It's not delineated. It's called a lump sum. I can't speak to what specifically it's for, but it's called a lump sum. It's consideration for the release, and that's all I can tell you. All right. So it could be for anything, paying for a rental car or whatever. Well, this is not part of the record, but in my experience, when you have a property damage release, that's generally something that's covered. The insurance policy is not in the record, correct? That is correct. Just going back to the release then. So in terms of the schedule of benefits, that's what's listed here. Not to exceed $15,000 for medical, dental, surgical treatment, ambulance, hospital, professional nursing, prosthetic devices, and that's it. So there's no physical therapy. There's no pain and suffering. There's no lost time. There's no loss of normal life. There's no disability covered by that. As to the non-economic damages that you just listed, Justice, I would agree with you. There's nothing specifically listed. As to the physical therapy, I think that would likely be included in medical, but I don't know if that's ever been interpreted. Well, regardless, pain, suffering, lost time, disability, loss of normal life, those are not released. I would agree with you that the document does not specifically list them in that paragraph. Okay. Now, the $15,000 is not a lump sum. That is, upon submission of a medical bill, they'll pay it, and that's the cap. That's correct. So the insurance adjuster, was there any evidence as to the extent of that adjuster's experience? I cannot speak to that, Judge. It's not in the record. All right. So one can assume that the adjuster has experienced other cases. This is a rear-ender in which liability is likely to be 100% for any and all damages that ensue. So obviously this bargain works quite clearly to the benefit of State Farm, but what is the consideration that is received in exchange by the plaintiff? Well, to the first point of the analysis, that it's a straightforward liability on a rear-ender, I can tell the court that I've litigated multiple rear-enders and got not guilties. So to that, I would respectfully disagree as to what the consideration was that was given for the release. It is that $800 lump sum and the promise to pay $15,000 over the next 180 days for those elements that are listed. All right. And it doesn't say on which side this is coming, her own policy or the driver of the other car. Well, I believe it's assigned a claim number. When Ms. Aulani contacted State Farm the following day after the motor vehicle accident, that claim number was for damages resulting that she's making against a third party, presumptively. But you're correct. It doesn't specifically list that this is a first party or a third party release being issued to her. I would stipulate to that. All right. There's one other sentence in there I didn't understand. The execution of this release does not bar the right of the parties released here under to pursue available legal remedies against the undersigned, his or her heirs, executors, agents, and assigned. So does that relieve that that does not limit State Farm from filing suit against the plaintiff? State Farm is not a party to the release. The release is Sammy Harshaw, the defendant. It is not a mutual release. Well, that is accepted by State Farm Mutual Insurance Company authorized representative Aaron Haney. Isn't he a signatory to this agreement? No. My belief is the undersigned releases and forever discharges Sammy Harshaw and Jeffrey Iskra. It makes no release of State Farm in any capacity to the best of my knowledge. I don't see the defendant is not listed on this document. It is, Your Honor. Right under schedule of benefits in that next following paragraph, the undersigned hereby releases. The names of the defendants and I believe the vehicle owner is my assumption. Right. They're not undersigned. So that sentence I mentioned does not limit the undersigned from being sued. Correct. So the undersigned is the plaintiff. State Farm can still file suit. No. My understanding of that clause is that it makes this a unilateral release, not a mutual release, meaning that Samantha Harshaw and Jeffrey Iskra, should they have claims against Al-Ani, preserve those rights to file those claims and they are not affected by this release. Okay. I think that's all I have. Okay. Just one other thing I would mention. Should this court undertake to, you know, disagree with our position and remand this, I think there is a massive public policy issue. I would, you know, if this court were to say that releases are no longer valid as signed and we believe that if someone, for example, has a knee surgery and then subsequently develops after a total knee replacement a limp because of a bad hip and that was unforeseen in the future, that will open up a can of worms that will be on the ITLA website and every release will be subject to attack. And I don't think the court wants to go down that road. And if there's no further questions, I'll submit. Okay. Thank you, sir. I think we've covered the questions.  And thank you for listening for the bell. All right. Mr. Erdis, if you want to respond, you may do so. So no matter how you select, no matter how this case is sliced, State Farm baited their insured, baited, B-A-I-T-E-D, baited their insured into signing a release of all claims within 24 hours of an accident. And to the point of the court, it is not at all clear, even from a legal perspective, who we're dealing with at that moment in time, State Farm on behalf of Jasmine Alani, the plaintiff appellant, or State Farm on behalf of the at-fault driver, Samantha Harshaw. The e-mail says that we need your signature by April 29th. She signed it on April 23rd. She actually had, if I've got the timeline correctly, six or seven days to look at it and get it back to them because we're doing it by DocuSign. They say you can DocuSign it. She chose to sign it earlier. That was her choice. It wasn't State Farm's request. It wasn't State Farm's demand. It says, please sign by the 29th. And it also includes, do you have any questions, call. Did she ever call back? I don't think the record shows she did. The condition was, though, Judge, that if she doesn't sign that document, her claim may be delayed. No one wants their claims delayed. All that an injured party cares about after an accident is Absolutely. You want to have your obligations paid. But it doesn't happen that way because, well, she's never worked for the State of Illinois. We've had people not be able to be treated by doctors because they haven't gotten paid. It happens. And so I guess I don't understand why this is now unconscionable. Well, because of the short window of time in which it occurred. That, in my opinion, is what distinguishes this case from all the others. And it falls right in line with all the others, to be perfectly honest with you. That there was just, neither party knew the nature and extent of this individual's injury. Well, she, by the time she signed, she had been to the emergency room. She had been seen by a doctor and then signed the release the next day. So two points on that. My recollection is that she signed on the day that it was, according to her affidavit, it was signed on the day that she received the release, before she went to the emergency department. But regardless, it is undisputed that she signed it before any sophisticated diagnostic study revealed the MRI. Okay. So, again, your point is that that means that there's a mutual mistake because there were not sophisticated studies? Well, when I use the word sophisticated, what I mean is a radiograph that is capable of diagnosing an injury. You can't diagnose a herniated disc with an X-ray. So, counsel, I have a question. The case law that you're, there were essentially three cases that have been cited and argued over here, but some of those cases cited older cases. One of them is Flonkiewicz from 1976, where the circumstances surrounding a settlement show a great discrepancy between the amount of the settlement and the amount of the ensuing damages. The exercise of pressure to make the settlement or the occurrence of unforeseen or extraordinary complication in the known injuries. It clearly indicates the settlement was executed over a mutual mistake effect. So, what I'm asking you is, of each of these circumstances here, the great discrepancy between the amount of the settlement and the amount of the ensuing damages. Obviously, you've talked about the exercise of pressure to make the settlement. But then the occurrence of unforeseen and extraordinary complications. So, what about the argument just looking at the medicals here? You've submitted $16,000 in med bills. The settlement was for $15,000. So, how does that indicate a great discrepancy between the amount and how does that describe an occurrence of unforeseen or extraordinary complication in the known injuries? Well, the answer is because she received literally nothing for the nature and extent of her injury. She received nothing for the nature and extent of her injury. And, in fact, I think the record even shows that State Farm didn't even pay the $15,000 that they were obligated to do. And her medical expenses, in fact, exceeded $15,000. So, you're talking about an insurance company who is obligated to pay all of the medical, an amount for the pain and suffering, future pain and suffering, lost wage, future lost wage, nature and extent of someone's injury. That would be an action against State Farm, though. No, it's an action against the at-fault driver. The action is against the individual that caused the damages. And State Farm is obligated to indemnify her. So, State Farm is on the hook for her. Assuming the release is valid on its face, what negotiations were there with State Farm to try to get them to pay the bills? They refused. They're not obligated to pay the bills by virtue of that release, which was… No, the release said that they would pay up to $15,000 in medical bills. I think it was within six months of a period of time. And then they had the ability to dispute the causation relative to that. So, it's not fair to an insured. It's not fair at all. How is this not unconscionable where this happens within a 24-hour period when nobody knows what we're releasing? When was the full extent of her injuries known? I think within that six-month frame. Certainly within that six months. Would a release signed a month later be valid on its face? To answer that question, that's a great question. In my judgment, it would be multifactorial. When she has the advice of legal counsel, perhaps. When she has satisfied herself as to the nature and extent of her injuries. Fairly. Fairly. In doing so within 24 hours where the multitude of injury claims become manifest within a week, two weeks, a month, sometimes a year. So, in order for a release to be valid, the injured party who's insured by State Farm would have to know the full extent of the injuries and the ramifications later on. I think the answer would be fair and reasonable. I think the party, the plaintiff, would have to have a fair opportunity to explore the nature and extent of her injury. All right. The buzzer, our official kitchen timer, has gone off. And so thank you, gentlemen, for your arguments here today. We will take the matter under advisement. We'll get you a decision in due course. And we will stand in recess for a short time to prepare for our next argument. Thank you.